IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| EILEEN THEDINGA, | HONORABLE JEROME B. SIMANDLE |
| Plaintiff, | Civil No. 05-5958 (JBS) |
| v. | |
| MICHAEL J. ASTRUE, Commissioner of the Social Security Administration, | **OPINION** |
| Defendant. | |

APPEARANCES:

Jordan R. Irwin, Esq.
Begelman & Orlow, P.C.
411 Route 70 East, Suite 245
Cherry Hill, NJ 08034
        Attorney for Plaintiff

Christopher J. Christie
United States Attorney
        By:  Kristina Cohn
              Special Assistant United States Attorney
Social Security Administration
Office of the General Counsel
26 Federal Plaza, Room 3904
New York, NY 10278
        Attorney for Defendant

**SIMANDLE**, District Judge:

This matter comes before the Court on Plaintiff's appeal, brought pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), to review the final decision of the Commissioner of the Social Security Administration denying Plaintiff's application for Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income under Title XVI of the Social Security Act.  See 42 U.S.C.

§§ 401-34 (2007).  Plaintiff argues that the Administrative Law Judge ("ALJ") erred in determining that her physical and mental impairments did not meet or equal the listed impairments of 20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 12.04 and 12.06, and improperly evaluated Plaintiff's ability to perform work available in the national economy.  For the reasons explained below, the Court finds that the ALJ's evaluation of Plaintiff's physical and mental impairments is not supported by substantial evidence in the record, and will remand this case to the ALJ for further proceedings consistent with the reasoning in this Opinion.

I.   **BACKGROUND**

   A.   **Procedural History**

   Plaintiff Eileen Thedinga filed an application for Social Security Disability Insurance Benefits on June 14, 2003, alleging an onset of disability on July 23, 2002 due to major depression, anorexia nervosa, and severe anxiety.  (R. at 46.)  Her application was initially denied on November 5, 2003, and her request for reconsideration was subsequently denied on February 24, 2004.  (R. at 30, 37.)

   Plaintiff filed a request for hearing before an ALJ on March 26, 2004, which was granted, and the hearing was held on April 7, 2005 before the Honorable Paula F. Garrety.  (R. at 40, 22.)  On May 11, 2005, the ALJ issued a decision denying benefits, in

2

which it was determined that Plaintiff was not "disabled" as defined in the Act because her impairments, although severe, did not meet or medically equal one of the listed impairments in Appendix 1 of Subpart P, 20 C.F.R. § 404.  In addition, the ALJ determined that Plaintiff had the residual functional capacity to perform a significant range of light work for which a significant number of jobs were available in the national economy.  (R. at 20-1.)

Plaintiff appealed the ALJ's decision to the Appeals Council on July 6, 2005.  (R. at 11.)  The Appeals Council denied Plaintiff's request for review on October 20, 2005, and held that the ALJ's May 11, 2005 decision would constitute the final decision of the Commissioner of the Social Security Administration ("SSA").  (R. at 4.)  On December 23, 2005, Plaintiff filed the instant Complaint seeking a reversal of the ALJ's decision denying benefits or, in the alternative, a remand for further administrative proceedings.  (Pl.'s Br. at 3.)  On April 10, 2006, the Commissioner filed an Answer to the Complaint.

On January 8, 2007, the case was administratively terminated on account of Plaintiff's failure to prosecute, based on Plaintiff's repeated failure, over the course of six months, to file and serve her brief upon defense counsel and this Court, as required under Local Civil Rule 9.1(a)(3).  On January 12, 2007,

3

Plaintiff's counsel submitted a brief, and requested to reopen the case.  Defendant did not oppose Plaintiff's request to reopen this matter, and the case was reopened on March 26, 2007. Defendant filed a brief in opposition to Plaintiff's brief and this appeal is now before the Court pursuant to 42 U.S.C. § 405(g).

**B.   Plaintiff's Personal and Medical History**

1.   Plaintiff's Application for Benefits

Plaintiff Eileen Thedinga was born on January 19, 1966, stands five feet seven inches tall, and weighs between 98 and 122 pounds.[1]  (R. at 46, 73.)  Plaintiff holds a college degree.  (R. at 78.)  Between 1990 and 2002, Plaintiff worked as a sales representative for a pharmaceutical company.[2]  (R. at 74.)  In July 2002, Plaintiff left her job and received a private disability insurance benefit totaling approximately $3,800 monthly.  (R. at 74, 298.)  On January 2006, three years after she started receiving benefits, these benefits were terminated.

---

[1]  Plaintiff's weight is reported inconsistently throughout the record.  In the disability report accompanying her application for disability benefits Plaintiff claimed that she weighed 112 pounds.  (R. at 73.)  In the subsequent report attached to her request for reconsideration, she stated that she weighed 98 pounds.  (R. at 86.)  Finally, in the subsequent hearing before the ALJ she stated that her weight ranged from 115 to 122 pounds.  (R. at 297.)

[2]  At the April 7, 2005 hearing, the vocational expert testified that the tasks a sales representative had to perform were considered skilled and exertionally light in nature.  (R. at 309.)

(R. at 299.)  Plaintiff claims that she has been unable to work starting from July 23, 2002.  (R. at 46, 74.)  She applied for Social Security Disability Insurance Benefits on June 14, 2003, claiming major depression, anorexia nervosa, and severe anxiety, all of which limited her ability to work.  (R. at 46.)  She claimed that she had panic attacks accompanied by shortness of breath and chest pains.  (R. at 73.)  In addition, she continued to be preoccupied with her weight, stating that she would "do anything possible to look emaciated."  (R. at 70.)

In July 2003, Plaintiff completed an "Activities of Daily Living Questionnaire" in support of her application for disability benefits.  She indicated that in a typical day she took care of her two children (receiving help on certain days from a babysitter or her husband) and attended daily Alcoholics Anonymous ("AA") meetings.  (R. at 100.)  She also attempted to shop when she was not taking care of the children, prepared meals, did dishes, and drove.  (R. at 100-01.)  She indicated that she would continue seeing a therapist, and was on medication to treat her illnesses.  (R. at 102.)  She also reported that she broke her foot on May 20, 2003 when she fell down the stairs. (R. at 103.)  She was involved in multiple car accidents, and she was hospitalized twice in the past year for extreme anxiety and anorexia.  (Id.)  Finally, she stated that she has very poor concentration and a short attention span.  (Id.)

After the Commissioner denied her initial application, Plaintiff sought reconsideration of the rejected application, in which she re-affirmed that she suffered from major depression, anorexia nervosa, and severe anxiety.  (R. at 81.)  She claimed that her anxiety attacks were worse and occurred more frequently, and her anorexia prevented her from eating for "day[s] and weeks at a time."  (Id.)  In addition, she suffered from crying spells, memory loss, and extreme fatigue.  (Id.)  Plaintiff had been seeing her psychiatrist, Dr. Joel Glass, since she filed the claim, and was making efforts to go to a treatment clinic for treatment of her anorexia, and to obtain marriage counseling. (R. at 82-3.)  She reiterated that although she managed to take care of her personal needs, her pace in achieving those needs was slowed by her fatigue.  (R. at 86.)

On February 24, 2004, the Commissioner again denied Plaintiff's claims upon reconsideration, finding that Plaintiff's condition was not severe enough to keep her from working based on her age, education, training, and work experience.  (R. at 39.) Plaintiff subsequently filed a request for a hearing before an ALJ, whose decision denying benefits is before this Court.  (R. at 10.)

2.  <u>Medical Evidence Contained in the Record</u>

The record contains a substantial number of medical reports. A complete summary of the medical findings follows.

6

a.   <u>Joel Glass, M.D.</u>

From July 2002 through August 2003, Plaintiff was seeing her psychiatrist, Dr. Glass, on a biweekly basis.  (R. at 221.)  Dr. Glass found that Plaintiff suffered from a number of ailments that included an eating disorder, major depression disorder, and anxiety disorder.  (R. at 221.)  He indicated that Plaintiff was often very anxious and preoccupied with her bodily appearance.  (R. at 110.)  Dr. Glass described Plaintiff's mood as labile, tearful, depressed, and anxious.  (R. at 222.)  She had poor concentration.  (Id.)  He also indicated that Plaintiff's disorders manifested into daily symptoms of fear, heart palpitations, and crying spells, which lasted for as little as a few minutes to as long as an hour.  (R. at 223.)  Dr. Glass found that Plaintiff's prognosis was poor and that she was "unlikely to work for 2-3 years."  (R. at 225.)

To assist Plaintiff in her claim for Disability Insurance Benefits, Dr. Glass also completed a "Functional Capacity Assessment Form" on April 15, 2004 in which he assessed certain manifestations of mental impairments as being either present, absent, or insufficient for determination in Plaintiff's case.  (R. at 253-55.)  The assessment also allowed Dr. Glass to rate the severity of the impairments in relation to the Plaintiff's functional ability.  (R. at 256.)  Dr. Glass indicated on the

form that Plaintiff suffered from recurrent severe panic attacks[3]
and exhibited "sporadic" anxiety-related symptoms resulting in
complete inability to function independently outside the area of
Plaintiff's home.  (R. at 254.)  He also indicated that Plaintiff
suffered ailments including depressive syndrome characterized by
anhedonia or pervasive loss of interest in almost all activities,
sleep disturbance, decreased energy, feelings of guilt or
worthlessness, difficulty concentrating or thinking, and thoughts
of suicide.  (R. at 255.)  Dr. Glass also indicated on the form
that Plaintiff showed marked restrictions on activities of daily
living, marked difficulties in maintaining social functioning,
and marked deficiencies of concentration, persistence, or pace.
(R. at 256.)  Furthermore, Dr. Glass found that Plaintiff showed
a residual disease process that left her in a state where "even a
minimal increase in mental demands or change in the environment
would be predicted to cause [her] to decompensate."  (R. at 257.)
Finally, Dr. Glass noted that Plaintiff had a history of an
"inability to function outside a highly supportive living
arrangement, with an indication of continued need for such an
arrangement."  (Id.)

---

[3]   More specifically, Dr. Glass indicated in Plaintiff's
assessment form that she exhibited "recurrent severe panic
attacks manifested by a sudden unpredictable onset of intense
apprehension, fear, terror, and sense of impending doom occurring
on the average of at least once a week."  (R. at 253.)

8

b.   Behavioral Health Services at The Medical
     Center at Princeton House ("Princeton House")

Plaintiff entered Princeton House on August 6, 2002 seeking
treatment for her alcoholism relapse as well as
anxiety/depression disorder.  (R. at 162.)  She was under the
care of Illuminado Ortanez, M.D. and Paul Asand, MSW, CSW.  (R.
at 163, 167.)  Plaintiff was discharged on October 24, 2002 upon
having achieved "moderate progress" in overcoming her
depression/anxiety and remaining abstinent from alcohol and other
addictive substances.  (R. at 169.)  Upon discharge, Dr. Ortanez
encouraged Plaintiff to continue to address her low self-worth,
poor physical image, and marital issues with her individual
therapist, as well as to continue attending AA meetings.  (Id.)
The goal was for her to eventually return to work.  (Id.)

c.   Stephen J. Pilipshen, M.D.

While being treated at Princeton House, Plaintiff was
referred to Dr. Pilipshen in September 2002 for non-specific and
intermittent lower abdominal pain.  (R. at 202.)  Plaintiff had a
CT scan that suggested ileocecal thickening and an abnormality
requiring evaluation with colonoscopy.  (Id.)  A full colonoscopy
was performed that revealed no abnormal results, and a further
digital examination indicated no palpable abnormalities.  (R. at
203.)

d.   Stephen Byrne, M.D. and Maurice D. Leonard,
M.D., FACP

Dr. Pilipshen referred Plaintiff to Dr. Byrne seeking a second opinion on her lower abdominal pain since Plaintiff appeared to favor "going right to a surgical procedure to minimize her symptoms." (R. at 207.) The only reference in the record concerning Dr. Byrne's action in this matter is that Dr. Byrne referred Plaintiff to Dr. Maurice D. Leonard, M.D., FACP.

Dr. Leonard saw Plaintiff three times, starting in October 2002 for further evaluation. (R. at 213.) On Plaintiff's first visit, Dr. Leonard noted Plaintiff appeared to be in good health although she continued to have episodes of lower abdominal pain. (R. at 214.) Dr. Leonard ruled out carcinoma, gyn pathology, or Crohn's disease as causes for Plaintiff's condition. (Id.) Dr. Leonard diagnosed Plaintiff's condition as some mild inflammation in the area of the ileocecal valve and prescribed an antispasmodic medication. (Id.) On the second visit with Dr. Leonard in March 2003, Plaintiff complained of epigastric distress and diarrhea. (R. at 212.) Dr. Leonard noted that during this examination, Plaintiff's weight was down from 125 to 118 pounds. (Id.) Dr. Leonard diagnosed Plaintiff with gastritis and hyperacidity and prescribed her with Nexium and Levbid. (Id.) Plaintiff's third visit with Dr. Leonard occurred in July 2003. (R. at 209.) Plaintiff's weight during this examination was 115 pounds, and she was complaining of epigastric

10

pain.  (Id.)  Dr. Leonard increased her Nexium dosage and switched her from Levbid to Pamine.  (Id.)

e.  Michael Pertschuk, M.D.

Four days after she was discharged from Princeton House, Plaintiff began attending an eating disorder program offered by the Eating Disorders Treatment Center in Marlton, New Jersey on October 28, 2002.  Plaintiff's eating disorder symptoms included dietary restrictions to less than 800 calories a day and a history of self-induced vomiting up to 20 times a day.  (R. at 217.)  Plaintiff's weight on admission to the Treatment Center was 119 pounds and it quickly dropped down to 116 pounds before rising to 119 3/4 pounds at the time of discharge.  (R. at 218, 219.)  Dr. Pertschuk managed Plaintiff's medication until her discharge on February 19, 2003.  (R. at 219.)  Dr. Pertschuk noted that Plaintiff was going through a difficult marriage[4] and had a bleak and pessimistic outlook on the world.  (R. at 219.)  Dr. Pertschuk noted that the Plaintiff found the support of the program helpful, and she was giving more thought to the possibility of either returning to work or seeking other part time employment.  (Id.)

f.  Claudia Alberta, CSW

Plaintiff first visited Ms. Alberta, a clinical social

_____

[4]  Dr. Perschuk noted that Plaintiff's marriage was "at best fragile," and that she "seemed to be working more consciously toward the goal of separation."  (R. at 219.)

worker, in September 1995 for weekly therapy sessions to treat
her alcoholism, anxiety, and agitation.  (R. at 229.)  Ms.
Alberta's mental status examination on October 10, 2003 revealed
that Plaintiff was distracted, agitated, anxious, appeared
extremely thin and sickly, and had poor concentration and memory.
(R. at 228.)  Ms. Alberta noted that Plaintiff suffered from
panic attacks which occurred daily for 20-40 minutes, and
manifested symptoms that included sweating, desensitivity,
dizziness, shaking, and heart palpitations.  (R. at 229-30.)  Ms.
Alberta stated that due to Plaintiff's stress-induced starvation,
she had limited social interaction ability, which affected her
ability to interact with the public, ask simple questions, accept
supervisory instructions, get along with co-workers, and adhere
to basic neatness and cleanliness.  (R. at 230.)  Additionally,
Dr. Alberta found that Plaintiff was limited in her ability to
respond appropriately to changes in the work setting, be aware of
hazards, travel or use public transportation, set realistic
goals, and make plans independently.  (Id.)  Plaintiff's
prognosis ranged from fair to poor.  (Id.)

> g.   Louisa Latela, MSW, LCSW

On November 17, 2003, Plaintiff visited Ms. Latela, a
licensed clinical social worker, for individual psychotherapy
sessions in dealing with her eating disorder.  (R. at 251.)  Ms.
Latela noted that Plaintiff was improving, such as by gaining

insight as to her behaviors which enabled her to gain some control over her eating disorder.  (R. at 251.)  However, Ms. Latela also noted that Plaintiff continued to struggle with her eating disorder on a daily basis and relied on support.  (Id.)  In addition, Plaintiff had difficulty concentrating and experienced increases in anxiety.  (Id.)  Ms. Latela believed that Plaintiff's anxiety could make it difficult for her to effectively interact with peers and supervisors.  (Id.)

> h.   J.B. Weitzman, Ph.D.

In October 2003, Dr. Weitzman, a state agency physician, conducted an assessment of Plaintiff's medical disposition at the request of the SSA based on a review of Plaintiff's medical records.  Like Dr. Glass, Dr. Weitzman filled out the "Functional Capacity Assessment Form."  (R. at 233.)  Dr. Weitzman found that Plaintiff exhibited depressive syndrome characterized by anhedonia, appetite disturbance with changes in weight, and difficulty concentrating or thinking.  (R. at 236.)  However, Dr. Weitzman concluded that while Plaintiff suffered from a medically determinable anxiety-related disorder, Plaintiff's impairment did not precisely satisfy the diagnostic criteria specified in the form,[5] and instead found that Plaintiff suffered from "Anxiety

---

[5]  These criteria included:

1. Generalized persistent anxiety accompanied by three of the following: (a) motor tension, or (b) autonomic hyperactivity, or (c) apprehensive expectation, or (d)

Disorder Not Otherwise Specified" or "Anxiety NOS."  (R. at 238.)

Additionally, Dr. Weitzman found that Plaintiff suffered from "anorexia nervosa" disorder and alcohol abuse.  (R. at 239, 241.)  With regard to Plaintiff's functional limitations, he determined that Plaintiff suffered from moderate restrictions on daily activities, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace.  (R. at 243.)  Plaintiff's mood was labile and would need assistance overcoming her anxiety. (R. at 245.)  Although Plaintiff's concentration was somewhat diminished, Dr. Weitzman found that she was fairly independent, was able to drive, and was cognitively intact to which she appeared to have the ability to relate and adapt to simple, routine work.  (R. at 246.)  Finally, Dr. Weitzman determined that Plaintiff's residual functional capacity was not significantly limited, and he saw no evidence of functional

---

vigilance and scanning
2. A persistent irrational fear of a specific object, activity or situation which results in a compelling desire to avoid the dreaded object, activity, or situation
3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average of at least once a week
4. Recurrent obsession or compulsions which are a source of marked distress
5. Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress.

(R. at 38.)

limitation.  (Id.)

i.   Thomas Harding, Ph.D.

Dr. Harding reviewed all the evidence in the file and he concurred with Dr. Weitzman's prognosis.  (R. at 233.)

**C. June 14, 2003 ALJ Hearing**

Plaintiff attended the hearing with her representative.  (R. at 292.)  The ALJ took the testimony of the vocational expert. The ALJ questioned the vocational expert using a hypothetical question which assumed that Plaintiff could perform routine, simple tasks and inquired whether someone with Plaintiff's limited capacity could find work in the national economy.  (R. at 310.)  The vocational expert responded that while Plaintiff would be precluded from resuming her past work, she could be able to work in a low-stress, light, and sedentary unskilled occupation such as a bench assembler of small products, a garment sorter/folder, a ticketer, or a hand trimmer/inspector.  (Id.) Plaintiff's representative questioned the vocational expert on whether Plaintiff would be able to do the jobs he had listed if she had difficulty concentrating.  (Id.)  The vocational expert responded that she would not be able to sustain the employment if she failed to meet production numbers or quotas.  (Id.)

On May 1, 2005, the ALJ issued her decision denying benefits.  (R. at 16.)  Her findings included the fact that Plaintiff had a severe eating disorder and depression/anxiety but

15

not an impairment or combination of impairments listed or medically equivalent in Appendix 1, Subpart P, Regulation No. 4. (R. at 20.)  Additionally, the ALJ found that Plaintiff had a physical residual functional capacity to perform light, low-stress work involving routine simple tasks, and limited contact with the public and co-workers.  (Id.)  The ALJ found that Plaintiff's allegations regarding her limitations were "generally credible."  (R. at 20.)  The ALJ further found that Plaintiff could not return to any of her past relevant work despite her classification as a "younger individual" and possession of a college education.  (R. at 20-1.)  However, based on the testimony of the vocational expert and Medical/Vocational Guidelines, the ALJ determined that Plaintiff could do other work in the national economy, such as doing bench/assembly work, or working as either a garment sorter, a ticketer, or a hand trimmer.  (Id.)  Thus, the ALJ concluded that Plaintiff was not "disabled" within the meaning of the Act.

The Appeals Council denied the Plaintiff's request for review without comment.  The ALJ's decision became the final decision of the Commissioner.  Plaintiff's appeal is now before this Court.

## II. DISCUSSION

### A. Standard of Review

Under 42 U.S.C. § 405(g), Congress provided for judicial

16

review of the Commissioner's decision to deny a complainant's application for Disability Insurance Benefits.  Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995).  A reviewing court must uphold the Commissioner's factual decisions where they are supported by "substantial evidence."  42 U.S.C. §§ 405(g), 1383(c)(3); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001); Sykes v. Apfel, 228 F.3d 259, 262 (3d Cir. 2000); Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992).  Substantial evidence means more than "a mere scintilla."  Richardson v. Perales, 402 U.S. 389, 401 (1971)(quoting Consolidated Edison Co. V. NLRB, 305 U.S. 197, 229 (1938)).  It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Id.  The inquiry is not whether the reviewing court would have made the same determination, but whether the Commissioner's conclusion was reasonable.  See Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).  Thus, substantial evidence may be slightly less than a preponderance.  See Hanusiewicz v. Bowen, 678 F. Supp. 474, 476 (D.N.J. 1988).

Some types of evidence will not be "substantial."  For example,

> [a] single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence – particularly certain types of evidence (e.g. that offered by treating physicians) – or if it really constitutes not evidence but mere conclusion.

17

Wallace, 722 F.2d at 1153 (citing Kent v. Schweiker, 710 F. 2d 110, 114 (3d Cir. 1983)).

The district court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." Williams, 970 F.2d at 1182.  The reviewing court, however, does have a duty to review the evidence in its totality.  See Daring v. Heckler, 727 F.2d 64, 70 (3d Cir. 1984).  In order to do so, "a court must 'take into account whatever in the record fairly detracts from its weight.'"  Schonewolf v. Callahan, 972 F. Supp. 277, 284 (D.N.J. 1997) (quoting Willbanks v. Secretary of Health & Human Servs., 847 F.2d 301, 303 (6th Cir. 1988) (in turn quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951))).

The Commissioner has a corresponding duty to facilitate the Court's review: "[w]here the [Commissioner] is faced with conflicting evidence, he must adequately explain in the record his reasons for rejecting or discrediting competent evidence." Ogden v. Bowen, 677 F. Supp. 273, 278 (M.D. Pa. 1987) (citing Brewster v. Heckler, 786 F.2d 581 (3d Cir. 1986)).  Moreover, apart from the substantial evidence inquiry, a reviewing court is entitled to satisfy itself that the Commissioner arrived at her decision by application of the proper legal standards. Friedberg v. Schweiker, 721 F.2d 445, 447 (3d Cir. 1983); Curtin v. Harris, 508 F. Supp. 791, 793 (D.N.J. 1981).

**B. Legal Standard for Social Security Disability Insurance Benefits**

The Social Security Act defines "disability" as "an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In order to determine whether or not Plaintiff is disabled under the Act, the Commissioner applies a sequential analysis codified in 20 C.F.R. § 404.1520. The Commissioner evaluates each case according to a five-step process until a finding of "disabled" or "not disabled" is obtained. 20 C.F.R. § 404.1520(a). This five-step process is summarized as follows:

1. If the claimant currently is engaged in substantial gainful employment, he will be found "not disabled."

2. If the claimant does not suffer from a "severe impairment," he will be found "not disabled."

3. If the severe impairment meets or equals a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 and has lasted or is expected to last for a continuous period of at least twelve months, the claimant will be found "disabled."

4. If the claimant can still perform work he has done in the past ("past relevant work") despite the severe impairment, he will be found "not disabled."

5. Finally, the Commissioner will consider the claimant's ability to perform work ("residual functional capacity"), age, education and past work experience to determine whether or not he is capable of performing other work which exists in the national economy. If he

> is incapable, a finding of disability will be entered.
> On the other hand, if the claimant can perform other
> work, he will be found not to be disabled.

See 20 C.F.R. § 404.1520(b)-(f).  Entitlement to benefits is
dependent upon a finding that the claimant is incapable of
performing some other type of work in the national economy.

This five-step sequential analysis incorporates a shifting
burden of proof.  Bowen v. Yuckert, 482 U.S. 137, 146-47 n.5
(1987); Wallace v. Secretary of Health & Human Servs., 722 F.2d
1150, 1153 (3d Cir. 1983).  The claimant carries the burden of
persuasion by a preponderance of the evidence to prove every
element of his or her claim in the first four steps.  If the
claimant is able to reach step five, the burden then shifts to
the Commissioner to prove that claimant is able to work: "Once a
claimant has proved that he is unable to perform his former job,
the burden shifts to the Commissioner to prove that there is
some other kind of substantial gainful employment he is able to
perform."  Kangas v. Bowen, 823 F.2d 775, 777 (3d Cir. 1987);
Olsen v. Schweiker, 703 F.2d 751, 753 (3d Cir. 1983).

**C. Analysis**

Plaintiff argues that the ALJ's analysis at steps three and
five of the above-described process is not supported by
substantial evidence in the record.  Specifically, with regard
to the ALJ's determination at step three, Plaintiff argues that
in finding that Plaintiff's impairments did not meet or equal a

listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1, the ALJ failed to account for several medically documented impairments without adequately explaining the reasoning behind her decision.  In addition, Plaintiff argues that in evaluating Plaintiff's ability to perform work available in the national economy at step five, the ALJ relied upon the testimony of a vocational expert, but failed to account for all of Plaintiff's impairments when posing hypothetical questions to the vocational expert.

For the reasons explained below, the Court finds that the ALJ's evaluation at step three is not supported by substantial evidence in the record, because the ALJ appears to have substituted her own medical judgments for those of Plaintiff's treating physician without providing an adequate explanation rooted in the medical evidence of record.  In addition, the Court finds that the ALJ's assessment at step five of whether there exists alternative employment which Plaintiff could perform is not supported by substantial evidence because the ALJ failed to present all of Plaintiff's significant limitations to the vocational expert.

### 2.   Assessment of Disability at Step Three

At step three of the analysis, the claimant bears the burden of proving that her impairments meet or equal a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1.

<u>Burnett v. Commissioner of Social Sec. Admin.</u>, 220 F.3d 112, 120 n.2 (3d Cir. 2000).  In <u>Sullivan v. Zebley</u>, the Supreme Court explained the implications of a finding of disability at step three.  <u>See</u> <u>Sullivan v. Zebley</u>, 493 U.S. 521, 532 (1986).  The level of severity required to meet or equal a listed impairment is higher than that needed to meet or equal the statutory standard for disability.  <u>Id.</u> at 532.  That is, the listings define impairments which would prevent an adult, regardless of his age, education, or work experience, from performing not just substantial gainful activity, but any gainful activity.  <u>Id.</u>; <u>see also</u> 20 C.F.R. § 416.925(a) (stating that the purpose of the listings is to describe impairments "severe enough to prevent a person from doing any gainful activity").  Hence, the listings operate as a presumption of disability.  <u>See</u> <u>Zebley</u>, 493 U.S. at 532.  If an adult is not working and possesses an impairment which matches or equals a listed impairment, that individual is conclusively presumed to be disabled and is awarded benefits without further inquiry.  <u>See</u> <u>Plummer v. Apfel</u>, 186 F.3d 422, 428 (3d Cir. 1999).  If a claimant fails to present evidence sufficient to meet or equal a listed impairment, the analysis proceeds to steps four and five to determine whether the claimant's impairments prevent her from performing substantial

gainful activity.[6]  Id.

In this case, the ALJ determined:

> The medical evidence indicates that the claimant has an
> eating disorder and depression/anxiety, impairments that
> are "severe" within the meaning of the Regulations but
> not "severe" enough to meet or medically equal, either
> singly or in combination[,] . . . one of the impairments
> listed under sections 12.04 and 12.06 in Appendix 1,
> Subpart P, Regulations No. 4.

(R. at 18.)  Section 12.04 lists the requirements for finding a

claimant disabled as a result of an affective disorder,

including depressive syndrome, and section 12.06 lists the

requirements for a finding of disability based on an anxiety-

related disorder.  §§ 12.04, 12.06.  The Court of Appeals has

summarized the criteria a claimant must establish under sections

12.04 and 12.06 as follows:

---

[6]  As the Court of Appeals has explained, "The Commissioner
has supplemented this sequential process for evaluating a
claimant's eligibility for benefits with additional regulations
dealing specifically with mental impairments." Plummer, 186 F.3d
at 428 (citing 20 C.F.R. § 404.1520a).  These regulations
require, inter alia, that the ALJ

> rate the degree of functional loss resulting from the
> impairment in certain areas deemed essential for work.
> If the mental impairment is considered "severe", the
> examiner must then determine if it meets a listed mental
> disorder. §  404.1520a(c)(2).  If the impairment is
> severe, but does not reach the level of a listed
> disorder, then the examiner must conduct a residual
> functional capacity assessment. § 404.1520a(c)(3).

Id. at 428-29 (footnote omitted).  Plaintiff's objections to the
ALJ's analysis do not concern the application of these
supplemental regulations to her case, but are instead aimed at
the ALJ's determination that her impairments do not meet or equal
a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1.

> The 12.04 and 12.06 listings at issue consist of paragraph A criteria (a set of medical findings), paragraph B criteria (a set of impairment-related functional limitations) and paragraph C criteria (a set of additional functional limitations). 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A). The required level of severity for 12.04 affective disorders is met when "the requirements in both A and B are satisfied, or when the requirements in C are satisfied." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04. The required level of severity for 12.06 anxiety-related disorders is met when "the requirements in both A and B are satisfied, or when the requirements in A and C are satisfied." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06.

Gantt v. Commissioner Social Sec., 205 Fed. Appx. 65, 66 (3d Cir. 2006). The paragraph B requirements of sections 12.04 and 12.06 are identical, and require that a claimant suffer from at least two of the following functional limitations: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning;(3) marked difficulties in maintaining concentration, persistence or pace; or (4) repeated episodes of decompensation, each of extended duration. §§ 12.04, 12.06.

Although Dr. Glass, Plaintiff's treating physician, indicated in his April 15, 2004 report that Plaintiff satisfied the first three of these criteria, (R. at 256), the ALJ did not afford controlling weight to Dr. Glass's conclusions, and found instead that Plaintiff did not meet any of the paragraph B requirements.[7] (R. at 18.) Finding that "Dr. Glass' assessment

---

[7] The ALJ seems to have assumed that the medical evidence satisfies the paragraph A criteria for both listings, since her

24

. . . is not consistent with or supported by the medical
evidence," (id.), but without identifying the inconsistent
medical evidence or explaining her reasons for giving it greater
weight than Dr. Glass' conclusions, the ALJ conducted her own
analysis of whether Plaintiff met the criteria listed in
paragraph B.  The ALJ determined that Plaintiff exhibited mild,
rather than marked, restrictions of activities of daily living
based on the fact that Plaintiff "keeps doctor appointments,
shops, drives, attends AA meetings, . . . performs household
chores[,] . . . maintains good grooming and takes care of her
personal needs." (Id.)  The ALJ determined that Plaintiff
exhibited only moderate difficulties in maintaining social
functioning based on the fact that "[s]he is the primary
caregiver of her two children, ages 3 and 5 (with help), and
relates well with mental health professionals." (Id.)  Finally,
the ALJ concluded that Plaintiff experienced only moderate
difficulties in maintaining concentration, persistence or pace
because she "can carry out numerous daily activities . . . which
shows[] that at the very least, she can carry out simple routine
job tasks." (Id.)  Finding that Plaintiff did not satisfy any
of the criteria listed in paragraph B, the ALJ concluded that
Plaintiff was not disabled under step three.

---

discussion of whether Plaintiff's impairments meet or equal those
listed in sections 12.04 and 12.06 focuses exclusively on the
paragraph B criteria.

While recognizing the deferential standard of review that courts must employ when considering the Commissioner's decision to deny a complainant's application for disability insurance benefits, Williams, 970 F.2d at 1182, the Court finds that the ALJ's determination that Plaintiff's impairments do not meet or equal a listed impairment is not supported by substantial evidence in the record.   The Court's decision is based on three considerations.

First and most importantly, the Court finds that the ALJ substituted her own judgment for that of Dr. Glass, Plaintiff's treating physician, without adequately explaining her reasons for discounting Dr. Glass' findings.   See Dew v. Bowen, 873 F.2d 1438 (4th Cir. 1989) (recognizing the importance of a physician's conclusions regarding the functional limitations listed in section 12.04(B)).   It is well-settled that the Commissioner cannot reject a treating physician's "medical determinations simply by having the administrative law judge make a different medical judgment.   Rather, the medical judgment of a treating physician can be rejected only on the basis of contradictory medical evidence."   Frankenfield v. Bowen, 861 F.2d 405, 408 (3d Cir. 1988).   Relatedly, "[w]here competent evidence supports a claimant's claims, the ALJ must explicitly weigh the evidence and explain a rejection of the evidence."   Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 435 (3d Cir. 1999).   In this case, the ALJ rejected Dr. Glass'

judgment on account of its inconsistency with "the medical evidence," (R. at 18), but neither specified which inconsistent medical evidence she was relying on, nor articulated the reasons for finding that it was entitled to greater weight than the opinion of Plaintiff's treating physician.[8]   The ALJ's vague allusion to inconsistent medical evidence does not provide "sufficient development of the record and explanation of findings to permit meaningful review." Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004).

        The Court recognizes that the record does indeed contain opinions that are inconsistent with Dr. Glass' findings, including the report of Dr. Weitzman, the state agency physician.  (R. at 233.)  However, it is not clear to the Court

---

        [8]  While Dr. Glass' findings concerning Plaintiff's functional limitations were not necessarily the product of "clinical and laboratory diagnostic techniques," 20 C.F.R. § 416.927(d)(2), the Commissioner's regulatory guidelines for evaluating medical opinion evidence identify a host of reasons for the ALJ to have deferred to Dr. Glass' opinions as to Plaintiff's functional limitations.  Dr. Glass had a treatment relationship with Plaintiff. Id.  Additionally, the treatment relationship included frequent visits and lasted for more than a year.  § 416.927(d)(i); (R. at 221.)  Also, Dr. Glass is a psychiatrist with specialized knowledge in the applicable medical field.  § 416.927(d)(5).  Although the ALJ was not bound to accept Dr. Glass' opinion without weighing it against the other medical evidence of record, Kent v. Schweiker, 710 F.2d 110, 115 n.5 (3d Cir. 1983), the ALJ was required to explain her reasoning in detail and with reference to the factors in the regulatory guidelines.  The ALJ's conclusory reference to inconsistent medical evidence, without specifying the evidence in question or explaining why it should be given greater weight than Dr. Glass' findings, does not provide the Court with sufficient information to determine whether the ALJ's decision is supported by substantial evidence.

that the ALJ relied upon Dr. Weitzman's findings in rejecting
Dr. Glass' conclusions concerning Plaintiff's functional
limitations, since the ALJ's assessment of the paragraph B
requirements under listings 12.04 and 12.06 are at variance even
with portions of Dr. Weitzman's report.[9]  In any case, even if
the Court were to infer that the inconsistent medical evidence
cited by the ALJ was meant to refer to Dr. Weitzman's report,
the Court of Appeals has "reaffirmed on a number of occasions
the principle that where a report of a treating physician
conflicts with that of a consulting physician, the ALJ must
explain on the record the reasons for rejecting the opinion of
the treating physician."[10]  Allen v. Bowen, 881 F.2d 37, 41 (3d
Cir. 1989).  The ALJ failed to provide an adequate explanation

---

[9]  For example, while the ALJ found that Plaintiff "presents
mild restrictions in her ability to carry out activities of daily
living," (R. at 18), Dr. Weitzman found that Plaintiff's
restrictions in this category were moderate, rather than mild.
(R. at 243.)  The Court is not aware of any medical evidence
supporting the ALJ's conclusion that Plaintiff's functional
restrictions in this category are only "mild."

[10]  In addition to citing an inconsistency between Dr.
Glass' report and unspecified medical evidence, the ALJ also
appears to have rejected some of Dr. Glass' findings because she
found them to be internally inconsistent.  In particular, the ALJ
found that Dr. Glass' conclusion that Plaintiff experienced
"marked difficulties in maintaining concentration, persistence or
pace" was not consistent with his finding that Plaintiff was able
to carry out short and simple instructions.  (R. at 18.)  Even if
this purported inconsistency provided a sufficient basis to
reject Dr. Glass' findings on the "concentration, persistence or
pace" prongs of listings 12.04(B) and 12.06(B), it would not
provide a sufficient basis to reject Dr. Glass' conclusions about
the remaining paragraph B criteria.

for rejecting Dr. Glass' opinion.

The second reason that the ALJ's step three analysis is not supported by substantial evidence is that the ALJ's decision does not accurately represent the evidence upon which she appears to have relied.  In performing her own assessment of whether Plaintiff satisfied the paragraph B criteria, the ALJ appears to have relied exclusively on Plaintiff's testimony at the April 7, 2005 hearing, which the ALJ found to be "generally credible."  (R. at 18.)  However, it does not appear to the Court that the ALJ's decision accurately reflects the testimony upon which she relied.  For example, the ALJ found that Plaintiff "maintains good grooming," (R. at 18), yet Plaintiff's only testimony on this issue was that she does not shower every day because she is too tired, though she manages to brush her teeth.  (R. at 306.)  Likewise, in finding that Plaintiff did not suffer from marked deficiencies in concentration, the ALJ pointed to the fact that Plaintiff can perform household chores, (R. at 18), yet Plaintiff's testimony indicated that she has difficulty completing her chores because she "start[s] one thing and . .. [does not] finish the next thing" because she is "scattered" and has "problems concentrating."[11]  (R. at 301.) This testimony does not appear to support many of the

_____

[11]  Plaintiff further testified that "the biggest problem . . . that prevents [her] from working" is the fact that she "can't concentrate."  (R. at 306-07.)

29

conclusions that the ALJ formed from Plaintiff's "generally credible" testimony.  (R. at 18.)

            Finally, the Court finds that the ALJ's determination that Plaintiff's impairments do not meet or equal the listed impairments at 12.04 and 12.06 is not supported by substantial evidence because the ALJ's evaluation was incomplete.  The required level of severity under section 12.04 is met when "the requirements in both A and B are satisfied, <u>or</u> when the requirements in C are satisfied," 20 C.F.R. Pt. 404, Subpart P, App. 1, § 12.04 (emphasis added), and the requirements for section 12.06 are met when "the requirements in both A and B are satisfied, <u>or</u> when the requirements in A and C are satisfied." <u>Id.</u> at § 12.06 (emphasis added).

      The ALJ failed to discuss the criteria in sections 12.04(C) and 12.06(C) altogether.  While the Court is willing to assume that the ALJ considered but rejected the applicability of section 12.06(C) because the evidence in the record does not indicate that Plaintiff suffers from a "complete inability to function independently outside the area of [her] home," § 12.06(C), such an assumption would not be reasonable in the case of section 12.04(C) in light of Dr. Glass' express finding that Plaintiff's condition satisfies the criteria of that listing. (R. at 257.)  The ALJ may have had a good reason to find that Plaintiff does not meet the impairments listed in section 12.04(C), but in light of the ALJ's failure to discuss the

section altogether, her decision is not supported by substantial evidence.  <u>See</u>, <u>e.g.</u>, <u>Schaudeck</u>, 181 F.3d at 435; <u>Barnhart</u>, 364 F.3d at 505.

In summary, the Court finds that the ALJ's conclusion that Plaintiff's impairments do not meet or equal the impairments listed in sections 12.04 and 12.06 is not supported by substantial evidence in the record.  The ALJ failed to articulate a clear rationale for disregarding the findings of Plaintiff's treating physician, misinterpreted or ignored Plaintiff's credible testimony, and failed to discuss components of the applicable listed impairments altogether.  Accordingly, the Court will remand this matter to the Commissioner so that the ALJ can conduct a proper assessment of whether Plaintiff's impairments render her disabled at step three.  On remand, the ALJ should explain on the record which aspects of Dr. Glass' findings she accepts and which aspects she rejects; cite to specific contradictory medical evidence in cases where she rejects the treating physician's conclusions, and explain her reasons for relying upon one piece of evidence over another; and determine whether the evidence of record shows that Plaintiff is disabled not just under paragraph B of sections 12.04 and 12.06, but under 12.04(C) as well.

> 2.   <u>Assessment of Residual Functional Capacity at</u>
>      <u>Step Five</u>

Plaintiff alleges that the ALJ's assessment of Plaintiff's

31

residual functional capacity at step five of the disability insurance benefits analysis is likewise not supported by substantial evidence because the ALJ failed to include all of Plaintiff's impairments when questioning a vocational expert about the availability of jobs for which Plaintiff is suited. The Court agrees, and provides the following guidance to the ALJ for further proceedings on remand.

The Commissioner's regulations provide that a vocational expert may be consulted "[i]f the issue in determining whether [a claimant is] disabled is whether [her] work skills can be used in other work and the specific occupations in which they can be used."  20 C.F.R. § 404.1566(e).  The Court of Appeals has repeatedly recognized that

> [w]hile the ALJ may proffer a variety of assumptions to the expert, the vocational expert's testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the question accurately portrays the claimant's individual physical and mental impairments.

Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984).  In other words, "[a] hypothetical question must reflect _all_ of a claimant's impairments that are supported by the record; otherwise the question is deficient and the expert's answer to it cannot be considered substantial evidence."  Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987) (emphasis added).

In this case, the ALJ posed the following hypothetical question to the vocational expert:

32

> I'd like you to begin by assuming that we're talking
> about an individual this claimant's age, education, and
> past work history.  I'd like you to further assume the
> individual is capable of performing a range of light
> work that is confined to routine, simple one- to two-
> step tasks.  The work should be low[-]stress in nature,
> and not afford more than limited contact with the public
> or co-workers.  Would this preclude the past work here?
> . . . . Are there other jobs that could be performed
> with these limitations?

(R. at 309-10.)  This hypothetical question does not reflect all
of Plaintiff's impairments for which there is record support,
and consequently, the expert's answer cannot constitute
substantial evidence.  Chrupcala, 829 F.2d at 1276.  The ALJ
failed to advise the vocational expert of several medically
documented impairments that might reasonably have altered the
expert's assessment of whether or not Plaintiff is capable of
performing work which exists in the national economy.  Most
notable among these omissions are Plaintiff's well-documented
panic attacks, which occur suddenly and unpredictably on a
weekly to daily basis and which cause Plaintiff to experience
heart palpitations and crying spells lasting for as long as an
hour.  (R. at 223, 229-30, 254.)  In addition, while the ALJ
herself recognized that Plaintiff's medications cause Plaintiff
to feel "fatigue[d]," the ALJ made no mention of Plaintiff's
fatigue when posing the hypothetical question to the ALJ.  (R.
at 19.)  The vocational expert should have been given the
opportunity to discuss whether an individual prone to these
additional impairments would be able to perform the jobs for
which he found Plaintiff adequately suited.  Podedworny, 745

F.2d at 218.  Because the question posed to the vocational
expert failed to account for all of Plaintiff's limitations, his
testimony does not constitute substantial evidence.  Chrupcala,
829 F.2d at 1276.

On remand, should the ALJ find that Plaintiff's impairments
do not satisfy the listed impairments under step three, then
when evaluating whether or not Plaintiff is capable of
performing work available in the national economy, the ALJ must
accurately incorporate Plaintiff's significant impairments when
questioning the vocational expert.  If the ALJ finds that the
medical evidence, including the findings of Plaintiff's treating
physician, does not show that Plaintiff suffers from panic
attacks and fatigue, then she must explain her reasoning for
excluding this evidence.  If the ALJ finds that the evidence
does establish that Plaintiff suffers from fatigue and panic
attacks, then these limitations must be accounted for in the
questions the ALJ poses to the vocational expert.

## III. CONCLUSION

For the reasons explained above, the Court will remand this
matter to Social Security Administration for a redetermination
of whether Plaintiff's impairments meet or equal a listed
impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1, and for
a reevaluation of whether or not Plaintiff is capable of

performing work which exists in the national economy.  The

accompanying Order will be entered.


**March 17, 2008**                          **s/ Jerome B. Simandle**
Date                                         JEROME B. SIMANDLE
                                             U.S. District Judge

35